THOMPSON
*vs*
THOMPSON.

---

## Thompson *vs* Thompson.

APPEAL FROM THE LOUISVILLE CHANCERY COURT.

*Trusts and Trustees. Construction. Decrees. Chancery.*

JUDGE EWING delivered the Opinion of the Court.

CAROLINE THOMPSON, in 1820, having entered into a marriage engagement with William F. Thompson, who had failed in business and was embarrassed with old outstanding debts, upon the eve of the marriage, at the instance and upon the solicitation of relations of both parties, and the sanction of her intended husband, executed a deed of trust to her brother Wm. L. Thompson, who had the entire confidence of the whole family, by which she conveyed to him all her estate, consisting of slaves, money, and demands for money, coming from her deceased father's estate, and her grand mother's estate, with the following declaration of trusts:

CHANCERY.

*Case* 61.

B. Monroe
2bm161
123   671

*December 25.*
The case stated.

Vol. II. 21

1. "That the said Wm. L. Thompson, his heirs, and assigns shall hold the said slaves and the future increase of the females, and the said money, debts and contracts, to the exclusive and sole use of her, the said Caroline, for and during her natural life, and not to the use or benefit of any husband which she may hereafter take, except so far as the said Wm. L. Thompson, his heirs, or assigns, shall think proper and choose to allow to her said husband or husbands.

2. That if the said Caroline shall marry, and afterwards become a widow, and she shall so desire it, the said Wm. L. Thompson, his heirs or assigns, shall reconvey and re-deliver the said slaves, money, debts and contracts, to the said Caroline, and in case she shall marry and die, leaving a child or children, the said Wm. L. Thompson, his heirs or assigns, shall hold the said slaves and their increase, and the said money, debts and contracts, and manage the same for the use of the said child or children, during his, her or their minority, and divide the same equally amongst them as they become of age or marry.

3. That the said Wm. L. Thompson, his heirs or assigns, may lawfully put any part of the said slaves into the possession of the said Caroline, and suffer them to remain in her possession during his or her will or pleasure, without being responsible therefor or guilty of a breach of this trust; nor shall he or they, or either of them be liable for any loss of said slaves, money, debts and contracts, or either of them, or of any part thereof.

4. The said Wm. L. Thompson agrees that he will, or his heirs or assigns shall, well and truly perform the trust aforesaid; and in case the said Caroline shall marry, it is agreed that the said Wm. L. Thompson may lay out and expend so much of her money as will enable her to procure the necessaries and comfortable means of house keeping."

Caroline Thompson died in 1827, leaving three children, William N., Maria, and Julia, the last of whom, being an infant at the breast, died shortly afterwards.

Wm. F. Thompson, in his own name, as heir of his deceased daughter Julia, and as next friend of Wm. N. and Maria Thompson, in 1835 filed a bill in his and their names against Wm. L. Thompson, the trustee, in which they charge that the defendant had obtained the possession of a negro boy by the name of Lewis in 1825, and a negro girl by the name of Nancy in 1828, two of the trust slaves, and had held and used them ever since, without accounting for their hire to Caroline or the infants, who were in necessitous circumstances and without the means of support or education, according to their station in life, and pray that he may account and pay over whatever may be in his hands·as aforesaid, and may be removed as trustee, and another person appointed in his stead, and for general relief.

The defendant answered, and in substance alleges, that shortly after the intermarriage of Wm. F. and Caroline Thompson, at the request of the former and· with the consent and approbation of the latter, he advanced to Wm. F. Thompson about $3000, it being the amount or thereabouts, that said Caroline was entitled to in money from her father's estate, as per the receipt of said Wm. F. Thompson exhibited; and owing to his embarrassed condition, permitted him to use his name in the purchase and establishment of a grocery store in the town of Henderson, Ky. the money aforesaid having been appropriated to that use for the benefit of said Caroline and her children. That having advanced the little capital furnished, as means of subsistence for himself and family, at his earnest solicitation and upon his representations that his family were without the means of subsistence, and would be greatly benefitted, if he would aid him in procuring and setting up a dry good store at the same place, he agreed to set him up again in the dry good business, and upon the settlement of his accounts he was found indebted to the firm of Thompson, Hill & Thompson and Thompson & Bayliss, about $800, which the respondent paid, the goods having been procured upon his responsibility, in which he claims to be secured by a writing executed by Wm. F. and Caroline Thompson, in 1827, authorizing so many of the

THOMPSON.
*vs*
THOMPSON.

slaves to be sold as may be necessary for his indemnity. He admits that he has had the management of Lewis and Nancy as charged, and received their hire, and instead of selling them, applied the same as a credit on the amount advanced by him as aforesaid. He denies, that by the terms of the trust he is bound to pay over to the infants any portion of the trust funds or profits, until they come of age or marry.

The decree of the Chancellor.

The chancellor, upon the bill and answer and exhibits, (there being no deposition in the cause but one, and that on the subject of the value of the hire of Lewis and Nancy,) among other things not necessary to be noticed, decreed that the trustee should account to the complainants for the money of their mother Caroline, received by the defendant from the estate of her father, with interest from the death of said Caroline, and also for the hire of Lewis and Nancy, with interest from the end of each year from the time he received them, disallowing any credit for advances made to the husband, also disallowing the claim of the trustee to retain the hire of the slaves as an indemnity for the sums paid for the husband to the two firms, as the balance for dry goods furnished, and ordered an account to be taken by the auditor, and intimated the determination to remove the trustee for a breach of trust upon the coming in of the report, and continued the cause for the report and for further decree.

Pet'n. for opening the cause.

Afterwards the defendant, by his counsel, filed a petition for opening the commission and for a re-hearing, accompanied with the affidavit of himself and counsel, detailing facts which go to show, that he and his counsel never regarded the $3000 advanced to Wm. F. Thompson as in litigation, or claimed or sought to be recovered, and never deemed it at all necessary to take proof in relation to it, and were wholly surprised and astounded by the decree for a re-payment of the amount and interest, and also with the affidavits of three of the relations of both parties, by which the answer of the defendant is substantially sustained, and by which it is further established in substance, that it never was the intention of the parties or of the deed, to place it in the power of the

trustee, only to advance the interest of the money or the hire of the slaves, but the deed of trust was made to keep Caroline Thompson's property from the creditor's of her intended husband, still leaving it in the power of the trustee to make advances to him to go into business, and that the money was paid to Wm. F. Thompson by the entire concurrence and consent of Caroline; that he was enabled thereby to go into business, and his family was thereby supported.

It was urged by the petition that the chancellor had misunderstood the deed of trust, in refusing to the trustee under the first clause, the right to make advances to the husband out of the principal of the trust fund at his discretion, and that if this interpretation of the first clause is not admissible, that as he was warranted under the last clause to lay out so much of the trust funds as would enable her to procure the necessaries and comfortable means of house keeping, as the same end was accomplished, and her and her family's comforts supplied out of the proceeds of the business in which the husband was set up by the advances which were made, upon more advantageous and economical terms than if the money had been from time to time directly advanced, that she or her children have no right to exact from the trustee, a re-payment of the amount so advanced, and so applied.

And grounds relied on for that object.

This petition was overruled by the Chancellor. And afterwards the defendant offered an amended answer, in which he alleges, that when his former answer was filed, he did not know and had no reason to believe, that the advance of $3000 was in issue or contested, or that the legality or propriety of that advance was disputed, or he would have answered and charged the matters set forth in this amendment, and taken proof and prepared the cause with a view to that matter; that the advance was made at the earnest request of his sister, said Caroline; that her husband was entirely destitute of pecuniary means; that they had nothing to purchase furniture and procure the necessaries for house keeping; and though he did, shortly after his marriage, commence a mercantile business, yet, that the furniture and means of living were all

Petition of defendant overruled and amended answer and cross bill and affidavits offered to be filed, and rejected by the Chancellor.

THOMPSON
*vs*
THOMPSON.

drawn, directly and indirectly, from the money so advanced, and the whole of it was consumed in the necessary furniture and living, and support of his family, and none of it applied to the payment of his old debts; that as well as the seperate receipt of Wm. F. Thompson, he took the joint receipt of himself and wife, for the amount advanced, which he has lost or mislaid, but which he hopes to be able to find, and when found, will exhibit. He makes his answer a cross bill, and propounds various interrogatories to the complainants.

Decree of the Chancellor.

The Chancellor refused leave to file this amendment, and upon a subsequent day, among other things, decreed that the trustee be removed and that Thos. Towles be appointed in his place, and that he pay over to Towles $6215 87 cents, the shares of the infant complainants, in money, which included in the estimate the advances made to the husband, and deliver to him their slaves, &c. And from this decree the defendant has appealed to this Court.

Questions presented for revision by the record.

Four questions arise upon this skeleton record, which are deemed necessary to be examined.

I. Was it competent for the trustee, within the terms or fair construction of the deed of trust, to make advances to the husband of Caroline Thompson, out of the *principal* of the trust fund committed to his charge.

II. If it were not competent, if the furniture, necessaries and means of support of Caroline and her children, were derived directly and indirectly, necessarily from the fund so advanced, can she or they ask as complainants in chancery, a reimbursement of the amount so advanced by the trustee?

III. Were the grounds for opening the commission and re-hearing of the cause sufficiently made out?

IV. Should the trustee have been removed, from any thing now appearing in the record?

In the construction of writings, the intention of the parties is the governing principle, and when the terms used are ambiguous, it is competent

1. The intention of the parties is a fundamental, and should be a governing principle, in the construction of all instruments, and when the language is ambiguous or of doubtful import, it is allowable to look behind the instrument into the state and condition of the parties, their motive, object, aim and end in its creation, as means of

leading to a proper understanding of its import. And further, the cotemporaneous construction and action of the parties interested under it, is entitled to great weight, and should be conformed to, carried out and sustained, if it can be done without doing violence to its terms.

Looking behind the deed of trust, in this case, we perceive that Caroline Thompson had a small estate in slaves and money to be collected, which, by its careful management and the joint exertions of herself and intended husband, might be made *barely to yield* a competent support for the two and their family, according to their state and condition in life, and the interest and profits alone from the same, was entirely inadequate to that end. He was destitute of means and embarrassed with old outstanding debts. Her means were of that description which would become absolutely his and subject to the payment of his old debts, whether he was willing or not, by the consummation of the marriage. She had contracted a marriage engagement with him and was upon the eve of entering into that relation. To guard her means from being wrested from their support and that of their family, and applied to the payment of his old debts, constituted a sufficient motive, and we have no doubt, as is abundantly manifested by the extraneous proofs, was the primary and leading motive, if not the sole motive for executing the deed in question. The act was not dictated by a want of confidence by her or her relations, in the future conduct of her intended husband, for she was about to manifest the fulness of her confidence in him by committing to him her destiny for life, and they by sanctioning and approving her choice. Nor is it reasonable to presume, that she or they looked to a future provision for *unborn* children, out of the *slender means* which she possessed; or that they ever contemplated a provision for them that would embarrass her and him in the enjoyment of her *own property,* or render her, with him, *destitute* of the necessaries and comforts of life. Nor is there a single suggestion in the extraneous proof, that there ever was a preliminary stipulation, or even suggestion made in reference to that object. The sole object seems to have been, to guard her estate from the old

THOMPSON
*vs*
THOMPSON.

to look into the state and condition of the parties, the probable motives and objects at the time of making it, and the cotemporaneous exposition of the parties, not however, doing violence to the terms of the instrument.

THOMPSON
vs
THOMPSON.

debts of the husband, and to place it in a condition that it might be rendered subsidiary to his and her, and their family's comfortable maintenance and support, at the discretion of a favorite brother, in whose judgment and integrity she and the whole family seem to have indulged the most implicit confidence. And this has been the cotemporaneous construction of the deed by all the parties, and their unvaried action under it, continued and acquiesced in, by them, their relations, friends and counsel, down to the annunciation of the decree in this case.

Is the language of the deed, without doing violence to its terms, susceptible of such interpretation as will support the objects intimated, and sustain the action of the trustee under it?

A claim in a deed of trust by an unmarried woman, requiring the trustee, if she desire it, to vest in her absolutely the trust property, in case she marry and her husband die, and also allowing the trustee "to lay out so much of her money as will enable her to procure the necessary and comfortable means of house keeping," may extend to the whole estate in money conveyed.

The deed was drawn in haste, upon the eve of the marriage, and most likely by an unskillful draftsman, to whom unfortunately, such important business is too frequently entrusted, and who, ignorant of the law and the force of legal terms, has not used the most appropriate language, or most lucid order to accomplish the main object intended, or most likely the wife, in the first clause, would not have been restricted to a life estate in the use of her own property. That an absolute provision for the children, beyond the control of the wife and trustee, was not intended, or looked to and made an irrevocable stipulation of the arrangement, as in a marriage contract, is apparent from the first clause of the second declaration of the trust, which requires the trustee, if she desire it, to re-invest the whole estate absolutely in her, in the event of her marrying and becoming a widow, and also from the fourth declaration of trust, which *allows* the trustee, if it does not impose upon him the imperative obligation, "to lay out so much of her money as will enable her to procure the necessaries and comfortable means of house keeping," which may extend to an entire exhaustion of her whole estate in money. And by the third declaration of trust, the trustee is allowed to place "any part of the slaves in possession of the wife, and permit them to remain with her during her pleasure, without accountability to the children." And a *sweeping clause* is added, securing the trustee from any liability to them

or any other, "for any loss of said slaves, money, debts or contracts, or either of them, or of any part thereof," which might, perhaps, without an unjustifiable extension of the broad language used, be made to cover and secure the trustee from any responsibility to them, for any loss resulting from advancements made to their father, which the trustee, in the exercise of a sound judgment and discretion, deemed essential to the well being, comfort and support of their mother, and themselves and family.

The latter clause of the second declaration of trust, which provides that, in the event of Caroline's marriage and death, leaving a child or children, the trustee shall hold the estate "for the use of said child or children, during his, her or their minority, and divide the same amongst them as they become of age or marry," cannot be construed to imply that the *whole principal* shall be retained and held by the trustee, and paid over to the children on the contingency mentioned, for such a construction is negatived and repelled by the last declaration of trust, which unquestionably allowed the trustee to make advancements out of her money, to enable her to procure the necessaries and comfortable means of housekeeping. The clause, therefore, can have relation only to what shall remain on hand unconsumed, of the principal, and proves nothing as to an intended provision for the children, or that the deed was dictated with a view to an ultimate provision for them, beyond the power or control of the mother or trustee, or that any restriction was intended by it to be imposed upon the trustee, against making any advancement to the husband or wife, which may be fairly implied from any other clause in the instrument. Even this contingent provision for the children, may have been framed with a view to the same primary object, the security of her estate, or so much of it as was left at her death, from passing into the hands of her surviving husband, and being subjected to the payment of his old debts.

There being nothing in the clauses cited, which negatives the main objects intended, namely, the security of the wife's means from the payment of the old debts of the husband, and the application of them to the comfort

And such a clause is not controlled in this respect, by a clause requiring the trustee, in case of the death of the mother, "to hold the estate for the use of children," and does not require that the whole principal, shall be withheld from the use of the mother, the maker of the deed.

THOMPSON
vs
THOMPSON.

and support of the family, without regard to any future benefit to the children, but as they all may be fairly construed to point to, and favor such objects, the question arises whether the first clause or declaration of trust may not be so interpreted as to authorize the trustee to carry out and accomplish those grand objects, by the powers conferred on him, to allow to the husband what ''he may think proper or choose to allow.''

That clause provides that, ''he shall *hold* the slaves, money, debts, &c. to the exclusive and sole use of her, the said Caroline, for and during her natural life,'' and not to the use of her husband, ''*except* so far as the said Wm. L. Thompson, his heirs or assigns, *shall think proper and choose to allow to her said husband or husbands*.'' The latter clause or exception applies either to the *use* or *interest* payable to the wife, and allows the trustee to pay a portion of it to the husband, or to the *principal fund held* by the trustee. If to the power to *use* only, then was the latter clause useless and accomplished nothing. For if the interest was paid to the wife, she, at her discretion, could allow and pay to the husband whatever portion of the amount she thought proper, without burthening the trustee with a delegation of powers to pay a part to the husband and part to her; or she might, without such clause, have directed the whole *interest* to be paid to him, this being unquestionably her separate estate. Besides, if paid to the wife, it would be subsidiary to the joint use and benefit of both, if it would not thereby become the absolute property of the husband and subject to his entire control.

But by applying the last clause as an exception or qualification to the *holding* of the *principal fund*, the sentence would run thus, that the trustee is to *hold* the *fund* for the use designated, except so far as he shall think proper or choose to *allow* to the husband. Or, in other words, he is to *hold the fund* to the use expressed, as the means of protecting it from old debts, but might make advancements out of *it*, to the husband, such as he, in the exercise of his judgment and discretion, might think best, in the promotion of the prospects, comforts and support of the married couple and their children. The

word "allow," applies more appropriately to the money fund in the hands of the trustee; the slaves were otherwise directed to be disposed of, in the subsequent clauses of the deed.

By making the latter clause apply to and qualify the first, and giving to the whole clause this construction, the object of the parties in the creation of the deed is effected, their cotemporaneous construction sustained and the action of the trustee under it supported. For if the power be allowed, we can annex to its exercise no limitation, as the deed annexes none. He may advance the *whole fund ar any part* of it. His judgment was confided in by the sister as more to be confided in than her own, and for whose welfare he could have no other than the kindest solicitude; the amount, time and object of the advancement were, therefore, trusted to him as more competent to decide than herself, and whose decision was to be guided alone by the dictates of his judgment. If, therefore, in the exercise of his judgment, he thought it best, and most conducive to the welfare and comfortable support of the whole family, to set up the husband in business, by advancing to him the whole small fund placed in his hands, it was competent and within the legitimate scope of his powers for him to do so, and he cannot be made responsible for a reimbursement of the amount to the children; and the more especially if he took care to guard the advancement against a coercive liability to old debts, and it was made by the sanction and approbation of the wife, and was applied directly or indirectly to her and the children's maintenance and support.

Indeed, considering that the property all belonged to the wife, and also, that the object, aim and design for conveying it, and that the *use* of the *principal* of the money was necessary for her and the family's comfortable support, and that the *interest* would be *entirely inadequate* to that *end*, we cannot doubt that it was the *intention* of the parties to allow her to *use* the *principal*, and we can scarcely doubt that the first clause of the deed may be so interpreted as to carry out that intention.

The money is to be *held for her use*—the trustee is not required to *loan* it out and pay her the *interest* only; to

*Margin notes:*

THOMPSON
*vs*
THOMPSON.

The true construction of the deed of trust is, that the maker thereof, for her comfortable subsistence, may draw from the principal as well as interest thereof, and the trustee cannot be charged by the heir with either.

Money to be useful must be ex-

THOMPSON
vs
THOMPSON.
───────────
pended in some-
thing to be used,
and so given,
implies its ex-
penditure.

hold it in his pocket or his desk it would yield no inter-
est, yet by doing so he would conform to the *letter* of his
instructions.    Money is *consumed* by the *use*, as it can
be fully *used* or *enjoyed* only by expenditure for some-
thing of value to be enjoyed, and when expended, the
specific money is never expected to be returned.    We
can, therefore, perceive no good reason why the *use* of
the money may not be construed to mean the *use* and
*consumption* of the thing itself, and not merely the *use*
of *interest* that may accrue from it, and the more espe-
cially when such appears to have been the intention of
the parties.

The facts of the case of Mountjoy and wife *vs* Lash.
brooks, 8th *Dana*, 33, in which this Court permits the
trustees to retain the money limited in trust for a daugh-
ter for life, in remainder to her children, and loan it
out, paying the interest alone to the wife during her life,
are essentially different from the facts in this case.
Without stopping to enumerate them all, we will men-
tion one: in that case the will limiting the trusts was
made by a *father* for the benefit of his daughter and
*grand children*, in which nothing appeared, indicating
that the latter, less than the former, were the objects of
his bounty, or intended to be provided for.

If the *use* of the *principal* was secured to her, it was
her own *separate estate*, and she had unquestionably the
right and power, though *feme covert*, to dispose of *it to*
her husband or any other, as a *feme sole*, with or without
the consent of her trustee, and might therefore authorize
the trustee to do so: *Roper on Property*, 184, 5, 6, 7, 8
and 9, and the authorities there referred to; *Clancy on
Rights*, 319, 320, and the authorities there referred to;
*Jacques* vs *the Methodist Episcopal Church*, 3d *John.
Chy. Rep.* 77; 17th *John. Rep.* 548, same case, and the
authorities cited in those two cases; *Whitaker* vs *Blair*,
3d *J. J. Marshall*, 230.    Chancellor Kent and the High
Court of Errors and Appeals of New York differ, in the
case of Jacques *vs* the Methodist Episcopal Church,
above referred to, only in this, that the former disallow-
ed the right of the wife to dispose of her separate estate
in any other way than that prescribed in the settlement;

the latter gave her unlimited right to dispose of it as a *feme sole* unless *restrained* by the deed, and this Court said, in the case of Whitaker *vs* Blair, that the authorities were with the latter, but the reason and force of principle involved, were with the Chancellor—and so this Court thinks; but neither questioned the power of the wife to dispose of her *present* separate personal estate, just as a *feme sole* could do, when no particular form was prescribed in the deed.

2. But if it be conceded that we are wrong in this interpretation of the rights of the wife, and of the powers conferred on the trustee, it is clear that the last clause or declaration of trust allows an advancement beyond the interest or profits. It provides that the trustee ''may *lay out* and *expend so much* of *her money* as will enable her to procure the *necessaries* and *comfortable means* of housekeeping.

The husband, being without means, as may be fairly implied from this provision, it would require an outlay of perhaps the one third of the whole sum advanced to the husband, to procure the furniture and other necessaries for *first setting* up or commencing house-keeping, in the style she had probably been accustomed to, and had a right to expect, as embraced within the terms of this provision. This sum, or whatever might be necessary for the purpose, the trustee had the right unquestionably, and it was his duty to lay out of the principal fund— and whether he paid it to the wife or laid it out himself, or paid it to the husband, if it was applied, directly or indirectly, from the proceeds of the business in which the husband was set up, can make no difference.

But the terms and scope of the last clause is not satisfied by furnishing the means barely to *set up*, in the *first instance*, the married couple to house-keeping, but authorized and justified an advancement from time to time, to procure the *necessaries* and *comfortable means* of house-keeping, so long as the wife might live. And, considering the husband's destitution of means, and the character of the estate of the wife, and small profits that it could be made to produce, it would require annually an expenditure of, perhaps, five or six hundred dollars or

THOMPSON.
*vs*
THOMPSON.

more, *to meet those continuing demands, which, in the seven years that the wife lived, would have more than exhausted the whole residue of the fund.* If the money was advanced to set up the husband in business, and the necessaries and comfortable means of support in housekeeping were more advantageously and economically supplied, from the proceeds of the business, the wife or children have no just grounds of complaint; nor can it make any difference whether the whole fund has been exhausted in this manner, or by direct payments in money from time to time, as their necessities or comforts might require.

Courts of equity look not to the form, but to the substance of things, not to the manner but to the end to be accomplished.

*A court of equity looks not at the form but at the substance; nor at the manner, but at the end accomplished.* It would be iniquity and not equity to allow the mother or children, after they have participated in living up the fund set apart for the necessities and comforts of the family, to ask a re-payment of the amount by the trustee; and *the more especially if the advancement was made to the* husband by her request or sanction. Indeed, it may be doubted whether the fund, *to the extent of the objects* provided for in the last clause, is not equitably subject to the direction and control of the wife, and if paid by her request or approbation to the husband, to set him up in business, as the means of enabling him to furnish the necessaries and comforts of house-keeping, whether the trustee in any event, could be made responsible to her or her children for a re-payment of the amount, whether the proceeds of the business was properly applied by the husband to those objects or not.

A court of chancery should not give a decree beyond the claims set up and claimed by complainant's bill, and sustained by proof.

3. *From the foregoing views, as to the construction of* the deed of trust, and other reasons which we will suggest, we are satisfied that the commission ought to have been opened, and a re-hearing granted. The only specific charge made, or claim set up in the bill, is for the hire of Nancy and Lewis—no charge is made or claim set up specifically for money which had been collected by the trustee from the wife's father's estate, nor for the money advanced to the husband; nor is there any charge of a misapplication of the trust fund, or a breach of trust in this particular. Nor is the attention of the trustee in

THOMPSON
vs
THOMPSON.

any manner directed to this subject, as a ground of complaint—and if the general language of the bill can be so construed as to embrace a claim for the demand in question, its general and ambiguous terms were calculated to delude and deceive the trustee, to throw him off his guard in the defence, and subject him to surprise.

He *was* deluded and surprised, and failed to make the defence which it was in his power to make, as abundantly appears by the affidavits of himself and counsel, and others, and a decree for an unjust demand obtained against him. The case was still in the power of the Chancellor, and we think the defendant should have been allowed time and further opportunity to make his defence complete.

He, it is true, in his answer, for the first time we hear of it in the pleadings, brings this demand out, and states it as having been advanced to the husband; but he states it as a link in the chain of the history of his conduct and that of the parties, and as inducement to the defence which he sets up against his liability for the slaves, and not as a specific ground of defence against any claim for it, set up in the bill; and if the answer is to be taken for confessed against the trustee, it should be taken altogether as a voluntary confession, and should not be permitted to stand upon the ground of an admission, in an answer made in *response* to an allegation in the bill, with additional matters in avoidance, which must be proved.

4. From any thing now appearing in the record, we perceive no good reason for removing the trustee; he was selected as trustee, and the property placed in his hands by a sister, who had full confidence in him and in his capacity and disposition to manage it to the best advantage, and her confidence was not shaken during her life. Upon slight grounds it should not be wrested from the the hands in which she has confided it, and placed in the custody of strangers, and especially at the instance of a reckless father. Fraud, a wanton negligence, or wilful breach of trust, or disregard of his fiducial duties, would alone justify his removal. So far from any thing of this kind appearing against him, when his acts are examined

The Chancellor should not wrest from the hands of a trustee, a trust confided to him, and place it in the hands of another, unless for fraud, wanton negligence of trust duties, or wilful breach of trust.

with charity, it seems that his object, according to his *understanding* of the powers conferred, was to promote the best interest of his sister, her husband, and the family; and to accomplish it and aid him in business, he incurred personal responsibilities, and made advances much beyond her funds in his hands, out of his own pocket. That he should be desirous of securing himself, and acting under a mistaken opinion of the rights and powers of his sister, he took her and her husband's signature to the instrument bearing date the 16th February, 1827, pledging the slaves, and authorizing their sale for his indemnity, ought not, in the absence of all proof of *intentional* imposition on his sister, to be imputed to him as a fraud; *but* the more especially as he has not attempted to sell any of them, but out of regard for the interest of the children, has waited the slow process of raising, out of the hire of two slaves, a large sum advanced.

Nor can the mere fact of a *claim* on his part, to retain the hire to indemnify him for past responsibilities, when the instrument is so framed as to look to future responsibilities only, be regarded as fraudulent, or furnish a good ground for his removal, and the more especially as the *money* was *paid* by the trustee, after the date of the instrument, and it may have been drawn with a view to continuing the husband in business, and the general language of the *concluding clause* may have innocently led the trustee into the opinion that he had a right to retain the hire for prior liabilities *subsequently* paid. But if his right to retain, and defence set up on this score, is disallowed and rejected, it should not subject him to so heavy a penalty as a removal from his trust, and more especially as he sets up another defence against paying the hire, profits, or principal to the children at all, until they arrive at age or marry, which, from the literal import of the deed is plausible, and to do which, he might innocently have doubted his powerr in any state of case. A mistake in either of these defences, or an innocent misapprehension of his powers under an instrument so ambiguous in its terms, ought not to subject him to removal. The Chancellor should rather

rather first lead and direct him in his duty, and if he then fails, remove him.

We would suggest, that we are inclined to the opinion that the trustee should have been allowed to retain the hire of the two slaves, Lewis and Nancy, up to the death of Mrs. Thompson.

It is the opinion of the Court, that the decree of the Chancellor be reversed and cause remanded, that the commission may be opened, the amended answer filed, and other steps taken that may be deemed necessary to a full investigation of the case upon a re-hearing. And the appellant is entitled to his costs in this Court.

*Guthrie* for appellant; *Pirtle* for appellees.