ISAAC H. RATHBUN, APPELLEE, V. JOHN MCCONNELL, APPELLANT.

[FILED JULY 11, 1889.]

Partnership: CONTRACT: CONSTRUCTION. Where the terms of a written agreement of partnership are somewhat vague and ambiguous, the practical construction of the contract of the parties themselves is entitled to great, if not controlling, influence.

APPEAL from the district court of Johnson county. Heard below before BROADY, J.

*O. P. Mason,* for appellant.

*S. P. Davidson,* for appellee.

MAXWELL, J.

This is an action to settle the affairs of a partnership. The plaintiff and defendant entered into a written contract as follows:

" This agreement, entered into this second day of August, A. D. 1883, between Isaac H. Rathbun, of Milan, Ill., of the first part, and John McConnell, of Bowling township, Rock Island, Ill., of the second part, witnesseth: the party of the second part agrees to buy the stock of drugs, paints, oils, fixtures, etc., now in the possession of the firm known and doing business in the town of Milan, Ill., under the firm name of Miller & Rathbun, paying therefor in good and lawful moneys whatever it may amount to, when invoiced according to the prices current of Colburn, Burks & Co., of Peoria, or of Lord, Stoutenburg & Co., of Chicago, Ill. And the party of the second part further agrees to advance money enough to make the amount of money advanced, and the value of the stock aforesaid, amount to the sum of $2,500, as against the experience in and knowledge of drug business, and influence of the party of the first part, thereby forming a copartnership to be known under the firm name of Rathbun & McConnell, for the purpose of carrying on a general retail drug business at any place within the United States which may be mutually agreed upon by both parties to the said agreement. The aforesaid copartnership to be known as a limited copartnership, to run three years from date of above agreement, and renewable only with full and free consent of both parties.

"Also that party of the first part and party of the second part are to become equal and joint owners of all the

stock, fixtures, and money aforesaid from the date of the agreement, and shall share equally and alike in all the profits arising and accruing from the said copartnership, but in no case does the party of the first agree to become responsible for any loss or damage which may occur from the said copartnership, or other than the usual losses from breakage and deterioration of stock and appurtenances.

"It is further agreed by both parties that they will do their best endeavor and use their best influence to improve and increase the business of the above copartnership; and that they will not either one draw out of the above copartnership any money other than is necessary for the living expenses of the parties aforesaid, but will apply all profits to increasing of stock until such a time as the stock shall be equal to the demands of the trade, or until the expiration of this agreement.

"It is further agreed by both parties that they will not go on any paper or writing as surety, bail, or bond, for any person or persons during existence of this copartnership; also, that they will not dispose of their interest in the same to any person or persons whomsoever, without the full and free consent of the other party.

"It is further agreed by both parties that they will live moral and temperate lives, and will not engage in any games of chance upon which there is any money or property at stake; also, that they will not engage in any but straight, legitimate business relating to the object for which the copartnership was formed, without the free and full consent of both parties, nor will they enter into any speculation separately or individually.

"It is further agreed that they will keep a record of all moneys received and paid out by the firm, and that all books and records shall be open to both parties for inspection at all times. All insurance, and necessary running expenses, are to be paid out of the proceeds of business;

also that due deference and respect be paid one to the other at all times.

" Witnesses present:      (Signed)
      " JOHN DICKSON.          ISAAC RATHBUN.
                              " JOHN McCONNELL."

This contract was entered into in Illinois, where the plaintiff possessed a drug store.   Shortly afterwards the parties removed to this state and opened a drug store at Crab Orchard, in Johnson county.   In 1885 they sold the third interest in the store to one Dilworth, and this firm continued in business until August, 1886, when the defendant claimed that the contract with the plaintiff had terminated and he sought to exclude him from the store. After some delay this action was brought to wind up the affairs of the partnership and divide the assets.   On the trial of the cause the court held that, as between plaintiff and defendant, the plaintiff was entitled to one-half of the capital stock paid in by the defendant.   In other respects there is no objection to the decree.   In construing the contract alone, that plaintiff and defendant " shall share equally and alike in all the profits arising and accruing from the said copartnership, but in no case does the party of the first agree to become responsible for any loss or damage which may occur from the said copartnership other than the usual losses from breakage and a deterioration of stock and appurtenances," these words apparently limit the interest of the plaintiff in the partnership business to a share of the profits.   But the parties themselves seem to have placed a different construction on the contract.   Thus in the winter of 1885-86 the plaintiff thought of changing his location, when a conversation took place between the defendant and Dilworth as to the interest of the plaintiff in the store.   Dilworth, who was called as a witness on behalf of the plaintiff, testified on that point as follows :

A. Mr. Rathbun was thinking some of going to Odell, I believe that was the name of the town, and Mr. McConnell and I had a conversation regarding this, and I asked him whether Rathbun would take out his part of the stock or sell it, and McConnell said he had not heard him say, but he supposed he would want to sell it, and he asked me whether I would, or whether I could buy one-half of the drug interest in the store; and I told him I could not do it, I didn't have the means to buy then; and McConnell said that he would buy it then, and own two-thirds of the stock and me one-third, or that he would buy it and sell to me on time so that I could pay for it without any trouble.

Q. About when was that conversation?

A. Well, I don't remember the date, but it was sometime during the winter of 1885 6.

· W. S. Dilworth, the father of the last witness, also testified on that point, as follows:

Q. Are you acquainted with the parties to this suit?

A. I am.

Q. State whether you had a conversation with defendant sometime during the winter of 1886, in reference to defendant and J. Milton Dilworth buying Dr. Rathbun out.

A. I had such conversation during the winter of 1885-6.

Q. What part of the winter, the latter or first part?

A. I could not say as to that.

Q. Tell the court what the conversation was.

A. I can tell you what gave rise to the conversation; what brought it about. The doctor had been out looking for a location, thinking he could do better somewhere else, not being satisfied with his practice at Crab Orchard, and I felt a little interested, my son being a member of the firm; I did not know what disposition might be made of the stock—I did not know anything of the contract between the parties. I met McConnell on the sidewalk and we had some other conversation about something else first; then it being on my mind, I asked him what disposition

would be made of the doctor's share, provided he retires; if he sells, you might get some other man you didn't want. He said, " If the doctor sold his interest, he would not sell out without the consent of the other parties, and they could buy him out; I told him my son I didn't think was able to buy the half interest in the doctor's share, and he said he would like to have him do so, so as to be an equal partner with him, but if he could not he would buy it and own two-thirds of the stock, but he would prefer that my son should buy, and be an equal partner, and if he wanted he would buy and sell to him on terms so he could buy. I still insisted that I didn't think he better do so, as he had about all he had in the firm and I didn't want him to get involved and in debt. That is about all I remember of the conversation.

The testimony of these witnesses is practically undenied by the defendant. This therefore may be taken as the construction placed on the contract by the parties themselves and will prevail over the mere words. In other words, the contract will be read in the light of the circumstances surrounding it. Where the language of a contract is ambiguous the construction placed upon it by the parties themselves is of great, if not controlling, influence. (*Topliff v. Topliff*, 122 U. S., 121; *Chicago v. Sheldon*, 9 Wall. U. S., 50, 54; *Coleman v. Grubb*, 23 Pa. St., 393, 409; *St. Louis Gas Light Co. v. St. Louis.*, 46 Mo., 121; *Jackson v. Perrine*, 35 N. J. L., 137; *Stone v. Clarke*, 1 Metc. (Mass.), 378; *Nickerson v. R. Co.*, 3 McCrary (U. S.), 455; *Gronstadt v. Withoff*, 21 Fed. Rep., 253; *Forbes v. Watt*, L. R., 1 Sc. & Div. App., 214; *Butler v. Moses*, 43 Ohio St., 166; 3 Am. & Eng. Encyc., 869.)

The construction placed upon the contract, therefore, by the court below is clearly right and the judgment is affirmed.

JUDGMENT AFFIRMED.

THE other Judges concur.