[No. 7390.  Decided June 25, 1908.]

JAMES H. CAUSTEN, *Respondent*, v. E. T. BARNETTE *et al.*,
*Appellants.*[1]

EVIDENCE—PAROL—WRITTEN CONTRACTS—INTENT — AMBIGUITIES—
PARTNERSHIP.  A contract is so ambiguous or indefinite as to admit
of parol evidence of the surrounding conditions and circumstances in
order to show an intent to form a partnership, where the contract
provided that, in consideration of a one-third interest in all mining
claims and property to be acquired, and one-third of the proceeds of
a stock of goods valued at $20,000, the plaintiff endorsed notes for
$6,000 to enable two others to take the stock into Alaska and estab-
lish a trading post and locate and deal in mining claims, etc., the
notes to be paid from the profits if sufficient was realized, and the
contract further providing that if the business should be continued
more than one season, each of the three parties to the contract shall
furnish, in addition to his services, one-third of the necessary funds
for the next season.

PARTNERSHIP—CONTRACT—CREATION OF RELATION—EVIDENCE—SUF-
FICIENCY—ACCOUNTING.  An agreement for a partnership, in effect,
or at least a joint venture of a fiduciary character, with the right to
an accounting for profits, is shown where, in addition to positive
testimony that a partnership was intended, the contract provided
that the plaintiff was to endorse notes for $6,000 to enable the de-
fendant and another, who originally were the sole partners in the
venture, to take a stock of goods, valued at $20,000, into Alaska and
establish a trading post and store; that, in consideration thereof,
he was to have a one-third interest in all mining claims and prop-
erty acquired, and one-third of the proceeds of the stock, the notes
to be paid from the profits if sufficient was realized; and that, if the
business continued more than one season, each of the three was to
furnish, besides his services, one-third of the funds necessary for the
next season; and where it further appeared that the defendant and
his partner in the venture had sustained a loss at sea, and being
unable to proceed, had disposed of the goods at a heavy loss, and
they sought assistance from the plaintiff, who personally signed the
notes mentioned in the contract and procured their endorsement by a
responsible party, his father-in-law, whereby the stock of goods was
repurchased and transportation procured to a remote and unknown
region where the trading post was established as contemplated by
the two partners in the first instance.

[1]Reported in 96 Pac. 225.

SAME—INEQUITABLE CONTRACT—RIGHT TO ACCOUNTING.  Such a contract is not so inequitable or unjust that an accounting will not be ordered, in view of the fact that the goods were sent to a wild and unknown region, before the discovery of gold there, where the risk of loss of the goods was great and the prospects of profits uncertain.

SAME—LACHES.  In such a case the plaintiff is not guilty of laches in not demanding an accounting from 1901 until 1906, where it appears that, when the notes became due, the defendant requested the consent of the endorser, plaintiff's father-in-law, to an extension of time, urging that it would be to the plaintiff's interest; that defendant, upon desiring to extend operations, had approached plaintiff for further advances and promised to make a statement of the condition of the business up to that time; and that he made no denial of the partnership and his obligation to account when interviewed by plaintiff's attorneys on the subject.

SAME—ACCOUNTING BETWEEN PARTNERS—INJUNCTION—PARTIES INJURED.  Where a partner is liable to an accounting, an injunction restraining him from disposing of alleged partnership property is properly extended to enjoin certain codefendants alleged to be his friends and relatives, in whom the defendant had placed the property in furtherance of his attempt to defraud the plaintiff.

Appeal from an order of the superior court for King county, Griffin, J., entered December 19, 1907, granting plaintiff's motion for a temporary injunction after a hearing upon affidavits and other evidence.  Affirmed.

*Kerr & McCord*, for appellants.

*John F. Miller, James McNeny,* and *Fred H. Lysons*, for respondent.

Root, J.—This appeal is prosecuted from an order granting a temporary injunction restraining the defendants Barnette, Hill, and Wood from receiving or attempting to take or receive, and from in any way disposing of, transferring, assigning, cancelling, or hypothecating certain shares of stock in the Gold Bar Lumber Company, represented by certificates issued by the company to Barnette, Wood, and Hill, and held by the Scandinavian-American Bank of Seattle, and also restraining the bank from surrendering the certificates.

to said defendants.   The defendants Barnette and Wood
claim that such shares of stock, at the time of the entry of
the injunctive order, were the property of the Fairbanks
Banking Company, a copartnership, engaged in a general
banking business at Fairbanks, Alaska, the members of which
were Barnette, Hill, and Wood.   The facts and circumstances
under which this litigation arose were substantially these:
In August, 1901, defendant Barnette and one Smith entered
into a co-partnership for the purpose of building a river
steamer, purchasing a stock of merchandise and supplies,
and establishing a trading post or posts in Alaska, and of
locating and causing to be located mining claims, and of
"grub-staking" miners and prospectors, and of dealing in
merchandise, supplies, mining claims, and carrying on mining
business in the district of Alaska.   They purchased a steamer
known as the "Arctic Boy," and a stock of merchandise of
the value of about $20,000, and loaded said supplies upon the
steamer to be transported to what is now known as the
Tanana country.   Shortly after leaving Saint Michael, and
before reaching the mouth of the Yukon river, the steamer
Arctic Boy became disabled and unseaworthy, and it was
necessary to beach her in order to save her and the cargo.
Barnette and Smith being without means to purchase an-
other steamer or hire the merchandise transported otherwise,
made a sale thereof to two men named Miller and Deane, at
a large sacrifice, and temporarily abandoned their enterprise.
Being desirous, however, of prosecuting their venture, they
enlisted the assistance of the respondent herein, who was con-
nected with the United States customs service and in a posi-
tion to secure the financial assistance or credit necessary to
further the undertaking.   At the request of Barnette and
Smith, the respondent secured the endorsement of their cer-
tain promissory notes, aggregating some $6,000, and en-
tered into and carried into effect negotiations whereby they

secured the return from Miller and Deane of the goods they had purchased. The notes were signed by Causten himself, and their payment guaranteed by one Hastings, a man of financial ability and father-in-law of respondent. Barnette, Smith, and respondent at said time entered into the following agreement:

"This contract and agreement made and entered into this 6th day of August, 1901, by and between E. T. Barnette and Charles Smith, parties of the first part, and J. H. Causten, party of the second part, witnesseth:

"That for and in consideration of endorsements of certain notes and other valuable services furnished by the party of the second part to the parties of the first part, the said parties of the first part hereby agree and bind themselves in addition to giving the party of the second part a third interest in all mining and other properties acquired, to pay to the said party of the second part, immediately after sale, one-third of the proceeds from the sale of a certain stock of general merchandise valued at about twenty thousand dollars, which it is the intention of the parties of the first part to take to a point on the Tanana river, in the American steamer Lavelle Young, for trading purposes, after deducting therefrom the original cost and all expenses incident to the transportation and ultimate disposition of the merchandise, including the cost of the steamer 'Arctic Boy' and the following notes:

"Note dated August 6, 1901, for $2,500 in favor of R. H. Miller.

"Note dated August 6, 1901, for $1,680.35, in favor of E. C. Deane.

"Note dated August 7, 1901, for about $2,000 in favor of the owners of the steamer Lavelle Young.

"Which said notes, in the event the merchandise should fail to sell for sufficient to cover all indebtedness, are to be paid pro rata from the gross receipts. That in the event the business should be continued after the winter of 1901 and 1902, each party is to furnish, in addition to his services, one-third of the necessary funds for procuring stock, transportation and all expenses necessary and requisite for plac-

ing such stock on sale at the trading post or posts in Alaska to be operated in the season of 1902 and 1903.

"In witness whereof we have set our hands and seals in triplicate at St. Michael, Alaska, this 7th day of August, 1901.                    Charles Smith.

"E. T. Barnette.

"J. H. Causten."

Barnette and Smith then proceeded up the Yukon river with the goods, and located a trading post at what is now Fairbanks, and located numerous mining claims on the Tanana river and its tributary creeks. Since that time Barnette purchased the interest of Smith in the enterprise, and has been carrying on business in various lines. He located or caused to be located numerous mining claims, and eventually entered into the banking business in connection with defendants Wood and Hill. The appellant Scandinavian-American Bank was the banking correspondent in Seattle of the Fairbanks Banking Company, composed of Barnette, Wood, and Hill. It is claimed by respondent that all of the funds used to establish the Fairbanks Banking Company and which they have used in their business came from the stock of goods hereinbefore referred to, and that the stock of the Gold Bar Lumber Company, the certificates of which are now in the hands of the Scandinavian-American Bank as the property of the Fairbanks Banking Company, is in reality property belonging to said Barnette and this respondent, and was purchased with funds traceable to the stock of merchandise taken up the river by Barnette and Smith at the time the contract was made with respondent.

It is urged by appellants that the contract entered into on the 6th of August, 1901, by and between Barnette and Smith and respondent did not constitute a partnership agreement; that respondent did not become a partner with Barnette by reason thereof, and has consequently no grounds for equitable relief. It is urged that the contract must be construed according to its terms, regardless of any evidence as to what

was said or done by the parties prior or subsequent to the execution thereof. Ordinarily a written instrument, if its language be clear and free from ambiguity, cannot be varied or contradicted by evidence of what was said or done prior to the time of its execution. But where the language employed is ambiguous or leaves it indefinite and uncertain as to what the parties intended, it is permissible to show the conditions existing at the time and the circumstances surrounding the transaction, and the words and conduct of the parties at that time in so far as they tend to explain the language of the written instrument; and where, as in this case, an accounting and equitable relief are sought by one who was a party to the written agreement and who asserts that the same was intended to be, and was, a partnership agreement, it is permissible for the court to receive evidence as to how the parties themselves have construed the written contract—as to whether the one disputing the alleged partnership has heretofore treated it as a partnership agreement. Aside from the positive evidence of several witnesses that a partnership was intended, and construing the language of this contract in the light of the circumstances surrounding the parties at the time it was executed and in the light of the conduct of the parties subsequent to its execution, we think that it was a partnership agreement somewhat akin to the grub-stake contract common in mining operations; or, if not strictly speaking a partnership, it was in effect such, and evidenced a joint venture by which a fiduciary relationship was established between respondent and appellant Barnette which justified the former in demanding and receiving an accounting and such equitable relief as would insure a realization of his property rights in the fruits of the enterprise.

In the case of *Chicago etc. R. Co. v. Denver etc. R. Co.*, 143 U. S. 596, 12 Sup. Ct. 479, 36 L. Ed. 277, the supreme court of the United States said:

"In the interpretation of any particular clause of a contract, the court is not only at liberty, but required to ex-

amine the entire contract, and may also consider the relations of the parties, their connection with the subject-matter of the contract, and the circumstances under which it was signed."

In *Reed v. Insurance Co.*, 95 U. S. 23, 24 L. Ed. 348, the court said:

"Although a written agreement cannot be varied (by addition or subtraction) by proof of the circumstances out of which it grew and which surrounded its adoption, yet such circumstances are constantly resorted to for the purpose of ascertaining the subject-matter and the standpoint of the parties in relation thereto. Without some knowledge derived from such evidence, it would be impossible to comprehend the meaning of the instrument, or the effect to be given to the words of which it is composed. This preliminary knowledge is as indispensable as that of the language in which the instrument is written. A reference to the actual condition of things at the time, as they appeared to the parties themselves, is often necessary to prevent the court, in construing their language, from falling into mistakes and even absurdities."

Page on Contracts, § 1126, has the following:

"If a contract is ambiguous in meaning, the practical construction put upon it by the parties thereto is of great weight. . . . Thus the practical construction by the parties may determine whether an ambiguous instrument is a partnership contract or not."

In the case of *Strong v. Eldridge*, 8 Wash. 595, 36 Pac. 969, this court used the following language:

"The rule is to so interpret the words as to carry into effect the intent of the parties as derivable from the whole instrument and surroundings, whether they have employed language accurately or not."

And in the case of *Dyer v. Middle Kittitas Irr. Dist.*, 25 Wash. 80, 64 Pac. 1009, the court spoke as follows:

"The court will, also, in determining the intention of the parties, look to the circumstances under which the contract was made, the subject-matter and the objects and purposes for which it was made."

Under this agreement, Barnette, Smith, and respondent joined in a common venture for profit. Each contributed money, goods, services, or credit, in order to make the enterprise possible, and there was a mutual agreement to divide the proceeds.

In the case of *Claflin Co. v. Gross*, 112 Fed. 386, in discussing a contract there involved, the court said:

"If this paper did not create a partnership relation between Barnitz and his associates in the enterprise, what contract relation between them did it create? Considering the paper as a whole, we find it impossible to treat it as merely providing for the payment to Barnitz of a share of the profits as a measure of compensation for services rendered to the business or for the use of money loaned or furnished in aid of the enterprise. There is, we think, no escape from the conclusion that by the terms of the written agreement Barnitz was a principal in the business conducted under it. It is clear to us that the written agreement of August 18, 1897, upon its face imports a partnership between the four persons who executed the paper."

In the case of *Ryder v. Wilcox*, 103 Mass. 24, the court said:

"In general, a participation in profits is alone sufficient to establish a partnership, unless it appears, from other circumstances and stipulations, that such was not the intention, . . . .."

In the case of *Morgart v. Smouse*, 103 Md. 463, 63 Atl. 1070, 115 Am. St. 367, the court said:

"As between the parties, partnership is a matter of intention to be proved by their express agreement or inferred from their acts and conduct. If they intend to and do enter into such a contract as in the eye of the law constitutes a partnership they thereby become partners, whether they are designated as such or not in the contract."

In the case of *Topliff v. Topliff*, 122 U. S. 121, 7 Sup. Ct. 1057, 30 L. Ed. 1010, the court quoted approvingly from a former decision where it was said:

"In cases where the language used by the parties to the contract is indefinite or ambiguous, and hence of doubtful construction, the practical interpretation of the parties themselves is entitled to great, if not controlling, influence."

In *Petrie v. Torrent*, 88 Mich. 43, 49 N. W. 1076, the court used this language:

"The complainant has a special interest in the profits, and he has a right to know how the account has been kept, what the trustee has done, and the balances from time to time since the amount of the purchase price has been paid. Equity will retain jurisdiction where fiduciary relations exist between the parties, and a duty rests upon the defendant to render an account. In *Darrah v. Boyce*, 62 Mich. 486, it was said by this court: 'It is true, the relation between the parties was not that of partners, but the trust reposed in and the business to be carried on by the defendant, and the accounting he was required to make, were fully equal to those of a partnership, and quite as confidential. . . . He was in possession of all the books and accounts relating to the business, and refused to give any account of sales, or of the place where made, or the amounts received on sales. Some sort of discovery is certainly necessary, and while, to some extent, it may be obtained in a court of law, perfect and complete disclosures as to all these matters may be obtained in a court of equity.' . . . We take it to be the well-established rule that the existence of fiduciary relations between the parties is sufficient to confer jurisdiction upon a court of equity whenever the duty rests upon the defendant to render an account."

In *Marston v. Gould*, 69 N. Y. 220, the court spoke as follows:

"Whether the property in the shares purchased was in the plaintiff and defendant as partners or not, the relation between them was of the same confidential and fiduciary character as between partners, and by analogy the same remedy in equity would be had for a violation of the trust by either, and a misappropriation or diversion of the stock or funds in which they had a common interest, or from which profits were to be made. Courts of equity hold each partner responsible to the other for all losses sustained by the misconduct or

a misapplication of the partnership funds. The same remedy exists against any one occupying the position of a quasi partner involving the same trust, duties and obligations. The action of the plaintiff was not therefore misconceived, whether it be regarded as an action for an accounting and a distribution of the profits, or for the adjustment of losses sustained by the misconduct of the defendant."

In *Hallett v. Cumston*, 110 Mass. 32, the court said:

"In this case the nature of the plaintiff's account is such that it can only be adjusted by a full examination and settlement of all the accounts and business of Cumston. He is entitled to his share of the net profits of the business. The difficulty in settling the account is the same as if he had been a partner. Complicated accounts of this character cannot be conveniently or accurately investigated and adjusted by a jury in an action at common law."

In *Garr v. Redman*, 6 Cal. 575, the court, speaking of the action, said:

"The action was properly filed for an account, whether the parties were technically partners or not. The character of the contract set out in the bill made an account necessary to determine their respective right."

See, also, *Brigham v. Dana*, 29 Vt. 1; *Cochrane v. Adams*, 50 Mich. 16, 14 N. W. 681; 23 Cyc. 452; 2 Lindley, Partnership, 493; Bishop, Contracts, § 404; *Rathbun v. McConnell*, 27 Neb. 239, 42 N. W. 1042; *Thompson v. Thompson*, 41 Ky. 161; *Miller v. O'Boyle*, 89 Fed. 140; Bates, Partnership, 30, 794; 22 Am. & Eng. Ency. Law (2d ed.), 27-29; *Dow v. Dempsey*, 21 Wash. 86, 57 Pac. 355; *Lawrence v. Halverson*, 41 Wash. 534, 83 Pac. 889; *Miller v. Price*, 20 Wis. 124; *Webster v. Clark*, 34 Fla. 637, 43 Am. St. 217, 27 L. R. A. 126.

It is urged by appellants that the agreement, if construed as a partnership, would be inequitable and unjust, and that it would be unconscionable to enforce it. It is not the purpose of this action to keep the agreement alive and further

enforce it; but to obtain an accounting. We can hardly
regard the contract as inequitable and unjust, when we take
into consideration the circumstances under which it was
made. Barnette and Smith were practically helpless finan-
cially; they were unable to proceed with their enterprise with-
out assistance. Respondent signed their promissory notes
and induced others to sign and guarantee their payment.
He assumed a large risk in so doing. Had the steamer that
carried the goods been lost at sea or wrecked while going up
the river, or had the goods been destroyed or lost otherwise,
Barnette and Smith would have been left without means to
pay the notes, and respondent would have been liable for their
payment. They were venturing an enterprise in a wild, un-
settled, and comparatively unknown region. They estab-
lished a trading post at the place where the city of Fair-
banks has since been builded. At that time gold had not
been discovered in that locality, and was not until one or two
years thereafter. This discovery was a most fortunate oc-
currence for the enterprise which these three men had under-
taken, and but for it the outcome would doubtless have been
very different from what it has been. On the part of respond-
ent, it was one of those venturesome projects which are oc-
casionally witnessed in a mining region, where men often
risk their time, efforts, and money on a chance. The under-
taking having resulted profitably, we think respondent is en-
titled to just treatment in the division of the proceeds. Of
course, we are not at this time called upon to consider what
character of division would be just and equitable.

It is also urged that respondent has been guilty of laches.
We do not think the evidence sustains this contention. It does
not appear that Barnette disputed the partnership of re-
spondent until shortly before the commencement of this
action in 1906. When the notes hereinbefore mentioned came
due, Barnette was unable to pay them and desired an exten-
sion. In order to secure this, it was necessary that Mr.

Hastings, the guarantor, should consent thereto. The latter testifies that Barnette, in requesting the extension, urged that it would be to the interest of Mr. Hastings' son-in-law, this respondent. There is evidence to show that when respondent and his attorneys interviewed Barnette relative to an accounting, he made no denial to them of the partnership or of his obligation to account to respondent. It is in evidence that, when he was desiring to extend his operations, he approached respondent for a further advancement of funds, and upon being asked for a statement of the condition of the business up to that time, promised to make the same.

It is further urged by the appellants that, even if it be found that there was a partnership between Barnette and respondent, yet that the injunction should be dissolved in so far as it affects the stock of the Gold Bar Lumber Company, or at least in so far as it affects the interests of appellants Wood and Hill therein. It is the contention of the respondent, however, that all of this property and all of the property of the Fairbanks Banking Company belongs to the partnership consisting of respondent and Barnette; that Barnette, as a part of the scheme to defraud respondent, caused much property to be placed in the names of relatives and friends, and that the interests in the name of Wood and Hill were placed in their names by Barnette as a part of his said scheme. The injunction was based, not only upon affidavits, but also upon the evidence taken in the case up to that time. This evidence is voluminous, and there is considerable conflict therein as to some of the matters involved. The trial court had the advantage of seeing and hearing the witnesses who appeared before him. Giving careful consideration to the admitted facts in the case and to all of the evidence, we think the trial court was right in concluding that respondent was entitled to an accounting and that the injunctive relief requested was appropriate. The conduct of appellant Barnette in connection with the suit is not calculated to inspire

the greatest confidence. It appears that he concealed himself and endeavored to avoid service of summons. Upon the witness stand, before a notary public at Fairbanks who had been agreed upon to take the evidence, he refused to answer many pertinent questions propounded by respondent's attorney, and many of the answers he gave were evasive. It also appears that, after a stipulation had been made between the attorneys for the respective parties, under the terms of which the books at Fairbanks were to be examined by respondent or his attorneys, Barnette and his attorneys (not the attorneys of record here) repudiated said stipulation and refused to allow respondent's attorneys to examine the books, after the latter had gone to Fairbanks for that purpose. The trial court thereupon made an order for appellants to bring said books into court, which order they have ignored and refused to comply with. It is also contended that appellant Hill aided appellant in violation of the trial court's order to not remove from the jurisdiction of the trial court to Alaska some $60,000 of the funds claimed to belong to respondent and Barnette, and that the latter was about to, and would have, removed all of the personal property in which respondent was interested, from the jurisdiction of the court, had it not been for the injunctive order.

We think the order was justified by the showing made, and it is hereby affirmed.

HADLEY, C. J., MOUNT, CROW, DUNBAR, and FULLERTON, JJ., concur.