[Civ. No. 3634. Third Appellate District.—November 17, 1928.]

JOE CHAMPAGNE, Appellant, v. T. B. PASSONS et al., Respondents.

I. Henry Harris and Chas. Mitschrich for Appellant.

G. P. Adams and W. W. Orme for Respondents.

PLUMMER, J.—This is an action by plaintiff for an accounting and division of profits based upon an oral contract relative to the development of a tract of land embracing 52½ acres. The trial court denied the plaintiff an accounting; held that the agreement sued upon being in the nature of employment, the defendant T. B. Passons had a

right to discharge the plaintiff at pleasure; and awarded judgment to the plaintiff for wages calculated on the basis of five dollars per day.

From this judgment the plaintiff appeals.

(During the course of this opinion the word "defendant" will be used as referring to T. B. Passons alone, unless otherwise stated.)

The record shows that on or about the month of January, 1922, the defendant entered into an agreement of purchase for the tract of land involved in this action, the purchase price being fixed at $25,000. After this agreement was entered into litigation arose, and for a period of about one year it appeared doubtful that title to the property could be secured. During this period the land was damaged to a considerable extent by flood waters, and the probability of developing the property so as to make it productive of any profitable income appeared doubtful. During this period of time the plaintiff and the defendant had been engaged in a ditch filling enterprise in which they were both jointly interested. The defendant was not able, of himself, to do the work necessary to develop the property in question, by reason of physical infirmities, while the plaintiff, as shown by the record, was an excellent worker, capable of directing the manual labor and performing the manual labor necessary to be done upon the premises to which the defendant desired to acquire title. With these circumstances in view the defendant proposed to the plaintiff, some time during the month of March, 1923, that they go in together in the development and exploitation of the land, and divide the profits between them, equally; that this association should be continued for three years from and after the thirty-first day of March, 1923, at which date an accounting was to be had and a division of profits made, if any. The agreement provided that the defendant was to contribute the money necessary to finance the enterprise, furnish the teams, machinery, and equipment necessary to be used in making the improvement; to pay for the land and to manage the business portion of the venture. The plaintiff was to contribute all his time and services to the improvement and development of the land during the three-year period; was to use the machinery and equipment in securing outside work whenever possible, and to turn over

to the defendant, to be applied to the common fund, all the earnings so obtained. These funds were to be taken charge of by the defendant, and an account kept thereof. Out of the money derived from the sale of products of the land or the land itself, and the earnings of the plaintiff, there should be paid the living expenses of the plaintiff and of the defendant's family, the expenses of developing and improving the land, and such items as might be properly attributed thereto. At the end of the three-year period it was agreed that an accounting should be had between them, at which time the plaintiff was to pay to the defendant one-half of the amount invested in the ranch, the improvements, the expense of development and operation, and living expenses, with interest thereon at the rate of seven per cent per annum. It was further agreed that the purchase price of the land should be reckoned at $28,000 in the settlement between the plaintiff and the defendant, the difference between the $25,000, the real purchase price of the land, and the price agreed upon, representing cost and expense and trouble of litigation incurred by the defendant. The agreement further provided that if at any time during the course of the three-year period and before the end thereof, the agreement was terminated, the plaintiff was to receive five dollars a day for the time that had elapsed after the thirty-first day of March, 1923, or that if the plaintiff died, within that period, the defendant would send to the mother of the plaintiff a like amount in lieu of plaintiff's interest.

After the making of this agreement the plaintiff proceeded to do and perform all the work contemplated under the agreement for and during the period of 14 months, earned approximately $5,000 by outside work which he either performed himself or had charge and management in the performance of by others. This money was turned over to the defendant, who took charge of it and entered the same in a book in which the receipts and expenditures were kept. It appears that the plaintiff and defendant obtained a book of accounts in which all the items showing receipts and expenditures during the period mentioned were entered. This account-book shows that during the period in question the total receipts amounted to the sum of $23,561.58, and the

total amount expended aggregated $17,970.88, leaving a net receipt of $5,590.70.

During the course of the fourteen-month period a part of the 52½ acre tract of land was subdivided and sold and the proceeds, so far as received from the sale thereof, it would appear, were applied on the original purchase price of the land. Just what amount of the proceeds of the sale of the subdivided tract were applied on the original purchase price does not appear. The defendant, however, testified that he was "pretty sure" that $9,100 of the proceeds of the sale of the subdivided tract were so applied.

The record shows that the work and labor performed by the plaintiff was entirely satisfactory, and that there was never any disagreement between the plaintiff and the defendant relative to the development work, the outside work performed by the plaintiff, or the handling or expenditure of any of the funds, and that the premises had been developed so that the unsold portion had reached the value of at least $60,000. On the second day of June, 1924, the defendant, yielding to the insistence of the defendant Ella M. Passons, his wife, acting upon the theory that the association was one of master and servant or employer and employee, notified the plaintiff that he would have to quit, or was discharged and tendered him five dollars a day for the fourteen-month period. This sum the plaintiff declined to accept, and thereafter instituted this action.

The trial court, among other things, found as follows: "That in the latter days of March, 1923, the plaintiff and defendant T. B. Passons, entered into a working agreement, but not a copartnership; . . . that said agreement between the plaintiff and defendant T. B. Passons was oral, and never reduced to writing; that in said agreement it was provided that the said property was to be developed and a portion thereof might be sold; that defendant, T. B. Passons, should advance such money as might be necessary to purchase such tools or implements as he did not then have, to be used in and about the development of said property; that the plaintiff was to devote his entire time and attention to the enterprise, and do any and all work necessary in the development of said land for a term of three years, without compensation, except that the defendant T. B. Passons should furnish the plaintiff with a room in his

house, board him, do his washing and furnish him with necessary spending money; . . . that in the event work could be obtained by using the tractor and other implements owned by the defendant, the plaintiff was to do said work, and the proceeds therefrom should be paid to the defendant, T. B. Passons; that either party to said agreement might terminate the same at his pleasure at any time during the said three years, and that in the event of such termination, at the request of either party, the plaintiff should be paid in full for his services, in addition to his board, room, washing and necessary spending money, at the rate of five dollars per day; that at the end of the three-year period, in the event that the agreement continued in full force during that time, and plaintiff had performed all his said duties under said agreement, an accounting was to be had between the plaintiff and defendant of all moneys had and received, at which time the plaintiff should pay to the said defendant one-half of all the moneys the defendant had expended in connection with said property, including the cost of the improvement, upkeep, and other expenses connected therewith, interest on said $28,000.00, and taxes, and that thereupon the said defendant would convey to the plaintiff one-half of all of said property remaining unsold, but there was no provision in said contract that in the event of a loss, any portion thereof was to be borne by the plaintiff.'' It may be here stated that the testimony shows without contradiction that the agreement between the plaintiff and the defendant provided that in the event of the land or improvement being washed away by floods, or that there was no profit, that the plaintiff was to have nothing for his three years' work and the defendant was to lose the money which he had invested in the property. This uncontradicted testimony appears to have been entirely overlooked. The trial court further found that under said contract the defendant had received approximately $16,000 on contracts of sale for the portion of the tract subdivided and sold, and that he would receive approximately the further sum of $25,000, and that the value of the remaining portion of the premises was about the sum of $60,000. The court also found: ''That for a long time prior to June 1, 1924, while the plaintiff was living in the home of the defendants, plaintiff spent a great part of his time in gambling in the house and on the

premises of the defendant, over the objections of the defendant, and for a long time prior to June 1, 1924, in the home of the defendants, he maintained intimate, illicit relations with women, and with one woman habitually for some time, without the consent of the defendants, or either of them.'' And after finding that the defendants objected to such conduct, the court found that on the first day of June, while such conduct on the part of the plaintiff was continuing, the defendant informed the plaintiff that by reason of such conduct and the plaintiff's refusal to desist therefrom, that he elected to and did terminate the agreement and offered to pay the plaintiff the sum of five dollars per day, etc.

The record shows that so far as objection to the gambling on the part of the plaintiff, in the house where the plaintiff and the defendant resided, is concerned, no objection was ever made thereto by the defendant. The record also shows that the defendant, at various times, participated in the games of poker that were played on the premises referred to, and the record further shows that no objection was ever made by anyone to whatever drinking took place upon the premises. The record does show, by the admission of the plaintiff himself, and not by any testimony introduced by the defendants, that some time during the year 1923 the plaintiff had had illicit relations with a certain woman on the premises occupied by the parties to this action, but of this the defendants had no knowledge until the date of this trial. There is no testimony, however, showing such relations at any time during the year 1924. The only testimony that lends any color whatever to the claim that the plaintiff was guilty of any improper act or conduct during that period is the testimony of Ella M. Passons to the effect that one night about ten days or three weeks previous to the second day of June, 1924, she passed through the lighted dining-room wherein was situated a cot on which a Mrs. Sullivan slept, and that as she passed through the room she saw the plaintiff engaged in rubbing the back of Mrs. Sullivan, and in explanation plaintiff stated that Mrs. Sullivan was ill and suffering from a severe backache. Mrs. Sullivan was clad in her nightclothes and the plaintiff had on his overalls (which we take to be ranch clothes). That there were any improper relations between

the plaintiff and Mrs. Sullivan was denied by both of them. The doors to the room were unlocked and, as stated, the room was lighted. It appears that the plaintiff occupied a bedroom which could be reached by going through the dining-room, and that the defendants occupied a room adjoining the room occupied by the plaintiff. The testimony does not show that anything was said to either the plaintiff or Mrs. Sullivan about this incident. That Mrs. Sullivan, who then was an employee upon the premises, was not discharged by reason of said incident, and remained on the premises until the house occupied by the plaintiff, the defendants and herself was leased to other parties—this lease taking effect on the third day of June, 1924.

The contention of the appellant is that the circumstances disclosed by the record establish a copartnership. On the part of the respondents it is urged that the relationship was terminable at the pleasure of either one of the parties, and that the relationship was one of employment. The trial court, as we have stated, found that the relationship might be terminated at the pleasure of either of the parties; found that there was no copartnership, and designated the arrangement as a "working agreement." As to what the agreement establishes, we think is shown beyond question by the testimony of the plaintiff and the defendant, between which there is really no substantial conflict. Other witnesses testified as to their recollection, as to what was told them, but as to the oral agreement we think the contract must be held to be such as testified to by the plaintiff and defendant as no other persons were present when it was made. The plaintiff testified in substance as follows: "T. B. Passons, in March, 1923, made me this proposition: He asked me if I would stick with him for three years, and at the end of three years to divide the ranch in half that he was going to buy. He said: 'If you don't want to stick with me, I can't buy the ranch.' He said he was going to develop the ranch to the best interests of the copartnership, and if we could sell part of it or all of it to good advantage, we would do it, and if we couldn't, we would divide the land at the end of three years. He was to attend to the business part, and I was to do whatever he told me about the working part. I was to work on the outside; that whatever money I could make would be turned over. The de-

fendant said he could attend to the financing part, either from the money from operations from sales of the ranch or work I did on the outside, and then borrow and pay from that. I was to get nothing for three years. At the end of three years I was to get half, after we deducted the cost of the ranch expenses with my half of the cost and expenses at 7 per cent interest; that if we could not meet our payments and we lost the ranch, I was to lose all my labor. If the water came up and we lost the ranch, he was to lose his money, I was to lose my labor. Each party was to buy his own clothes. The provisions for Mrs. and Mr. Passons and his family was to be charged to the account, and to be kept track of as expenses. In the event that we did not get enough out of the property, Mr. Passons was furnishing the money. If it came to losing his money, I was to lose my labor. When he told me what he would do I told him I would stick with him for three years. The only way he could let me go was if I died he was to pay my mother $5.00 a day for the time I had put in, including Sundays and holidays. Also, if I proved dishonest or refused to do my work.'' The witness then testified that an account-book was obtained and all the expenses of maintaining both the plaintiff and the defendants, and all the cost and expenses of managing the property, all the receipts from the property and receipts of money earned by the plaintiff for outside work and in managing the truck and tractor when used by other persons under his direction, were entered in this book so as to show a complete account which was to be taken into consideration at the end of three years in making division of the profits and with what remained in the event of there being any profit or property to divide.

Mrs. Passons, one of the defendants, testified as to her recollection of the agreement as told to her by the plaintiff and the defendant as follows: ''Mr. Passons said to the plaintiff: 'Now, I will make an agreement with you. If you will stay with me three years and fulfill all your work and do everything that you should, and at the end of three years you will pay half of the first cost of the place, which was $28,000.00, 7 per cent interest thereon, half of the upkeep and improvements, half of the living and all the expenses, then I will go 50-50 with you, but if at any time you do not do your work, or do not suit in any manner, you are to

take $5.00 a day for your work,' and the plaintiff replied, 'All right, I am perfectly satisfied.' He was to get his board, room and washing and the $5.00 a day all the time that he put in, if they did not get along or he did not suit.''

The defendant, after testifying as to the purchase of the ranch and that he bought it in pursuance of the contract therefor, herein referred to, testified as to what took place between himself and the plaintiff, as follows: ''Well, I had talked with Joe, that is, roughly, over the matter several times previous to this about his taking a working interest in this ranch. We were working together in filling a ditch, and we had talked it over in a rough manner, and we got it down to the point where we thought we could agree, and we went over it that night after we came in from work, like we had talked it over at different times. We got together where it seemed like it was plausible for everybody concerned, and that I was to pay the first costs of the ranch, which was $28,000.00. Mr. Champagne was to stay with me for three years. I said: 'Joe, we have about decided to go in together. Now, we want to understand each other thoroughly,' and I went into the first costs of the ranch, that he was to pay half of the first costs back, and he was to remain with me three years; he was to pay half of the expenses of the upkeep on the ranch and improvements on the ranch, at the rate of 7 per cent interest, and if we were together at the end of three years, after the expense of half of the upkeep, and I got half of my money back of the first cost, that he was to receive half of the net profits of this ranch, and in case we couldn't agree in the meantime, that Joe was to receive $5.00 a day straight for the time that he was with me.'' The defendant further testified that the word ''partnership'' was not used. Also testified as to the keeping of the accounts, and it may be here stated that there is no conflict in the testimony that all the expenses of operating the ranch, living expenses, etc., of all the parties was charged up, and that all of the money which came from the outside from work performed by the plaintiff, as herein stated, was entered in the account-book and used in payment of expenses of developing the land and maintaining the parties to this action.

While the court found that the agreement might be terminated at pleasure, the defendant, testifying along the

theory that the agreement was one of employment, testified as follows: ''Q. Well, you had a right to discharge him any time you felt like it? A. Not when I felt like it. Q. Well, you only had a right to do it then for cause; is that right? A. For cause, yes, sir. Q. And it was not understood that you could arbitrarily discharge him? A. I don't understand that question. Q. If the notion struck you that you did not want Joe at any time during the three years, you did not have the right to discharge him and give him $5.00 a day because he did something that was wrong. Is that right? A. Well, I couldn't do that just because I took a notion, if he hadn't done anything and everything was pleasant, why, I couldn't just say 'Joe, I don't want you any more; here is your money'; I couldn't do that.''

In relation to the land overflowing, the witness testified: ''It was understood that he go out and I go out without anything; we couldn't hold each other to nothing. Q. Well, now, I don't know that I have got it exactly clear, Mr. Passons, but you don't contend, do you, that you could if you wanted to, after Joe had worked there we will say a great length of time like 2 years, 11 months, if you made up your mind that you didn't like Joe any more, you were not as fond of him as you were, that you could discharge him and give him $5.00 a day for the 2 years and 11 months, although the property had advanced in value to a large sum of money? A. For no cause? Q. Yes. A. Why, no, I couldn't do that.'' While other witnesses testified some to the effect that they were told by the defendant, in the presence of the plaintiff, that in case of disagreement, either one could terminate the association, and some witnesses testified that they understood it could be terminable at pleasure, what we have stated, taken from the testimony of the plaintiff and the defendant, and in substance corroborated by Mrs. Passons, one of the defendants, we think must be accepted as correctly showing what the agreement was between the parties, and that as against the statement of the defendant, irrespective of the statement of the plaintiff that the contract could not be terminated at pleasure, is not really controverted by testimony of witnesses as to their recollection of the use of words and understanding gained by having the agreement related to them at a considerable period of time antedating the hour of giving their testimony.

█ It would serve no useful purpose to summarize the testimony of the different witnesses, but the record, a part of which we have set forth, shows beyond controversy, the following: That the property was purchased after the agreement was entered into between the plaintiff and the defendant dated as of March 31, 1923. That a contract for its purchase had been entered into a little over a year previously. That the development of the land was attended with difficulties. That it would require a great deal of labor. That the circumstances showed that everything put into the property might be lost. That the plaintiff and the defendant, on or about March 31, 1923, entered into an agreement to develop the property. That a portion of the property was to be subdivided. That the defendant was to advance the money for development and equipment. That the plaintiff was to devote his time and do all necessary work for its development, without compensation. That the plaintiff was to do outside work with the equipment, and turn in the earnings. That an account was to be kept of all the receipts and expenditures, including the costs and expenses of operating the land, payments made on the land, subdividing the land, and also of all money expended in paying the living expenses of the plaintiff and the defendants. That the plaintiff was to room with the defendants, and have his board and washing. That at the end of the three years an accounting was to be had of all the receipts and expenditures. That the plaintiff was to pay to the defendant one-half of all the money expended or that there was to be charged against the plaintiff one-half of all the money expended for all the items which we have mentioned, and interest thereon at seven per cent. The defendant was then to convey to the plaintiff one-half the property. That during the course of the fourteen-month period, some 20 acres of the land were subdivided and sold on contracts, the defendant having received approximately $16,000, and has coming on the contracts approximately $25,000 additional. That the plaintiff's work was satisfactory. That the work done with the equipment amounted to the sum of $4,981.04. That the plaintiff was ready, able, and willing to do all the work required of him. That the defendant was to attend to the financial part of the business, and the defendant was also to direct the work of improvement which was to be

performed by the plaintiff. The record shows that an account was kept of all moneys received as herein stated, the money paid for labor, for lumber, groceries, oil, gas, etc., one of the items charged as expenses for maintaining the plaintiff and the defendant or for maintaining a family being $500 for groceries. The costs of buying the horses was also entered as a charge, to be considered as an item of expense upon making settlement at the end of three years.

Irrespective of the finding of the court that the plaintiff and defendant entered into a "working agreement," we think the foregoing facts constitute, uncontrovertibly, a joint adventure. It lacked only one element of constituting a copartnership. It does not appear that the plaintiff had any authority to contract so as to bind the interest of both the plaintiff and the defendant, but it does appear that the plaintiff and the defendant were entering into an agreement or undertaking relative to the development and sale which included first the purchase price of the lands to be bought and all the expenses thereof, and were contemplating a venture where the defendant was staking what money it would be necessary to advance over and above the receipts that might be had, against the labor of the plaintiff. This, we think, without citation of authorities, conclusively establishes a joint adventure. If a joint adventure, irrespective of the fact that the defendant himself testified that the agreement could not be terminated at pleasure, then the finding of the court that the agreement could be terminated at pleasure has no support.

In 33 Corpus Juris, page 841, a joint adventure is defined as follows: "A joint adventure has been aptly defined as a special combination of two or more persons where in some specific venture, a profit is jointly sought without any actual partnership or corporate designation." We do not need to cite any further authorities than the chapter on joint adventure found in the thirty-third volume of Corpus Juris, beginning on page 839. Here, there is every element of the parties entering into an undertaking seeking a profit, and, in addition thereto, a stipulation that in a certain event one shall lose all of his labor, all the earnings that he has turned over to the joint account, and the other loses all the money that he has put into the venture.

■ We do not need to discuss the question as to whether the defendant did or did not have sufficient cause to cancel or terminate the agreement had it been one of employment. Not being one of employment, and there being no objection to the work carried on and performed by the plaintiff, all of which is expressly testified to by the defendant as being entirely satisfactory, no cause is shown for the termination or attempted termination of the relationship of joint adventurers, even though it may be conceded that the defendant had a right to insist that the plaintiff occupy some other room, notwithstanding at least six months had expired, if not more, since any conduct on his part was such as would have laid a foundation for terminating the relationship of employer and employee or master and servant, if such relation had existed. All we need to say is that the attempted cancellation of the defendant laid the foundation for an action of accounting on the part of the plaintiff, and the refusal of the court to take an accounting constitutes reversible error.

While the respondent has cited a few authorities to the effect that the relationship of master and servant may be terminated by reason of the improper conduct of the servant, those cases are not applicable for the reason that the relationship of master and servant did not exist in this case.

■ The fact that the agreement provided for a basis of settlement under certain contingencies did not warrant either party in arbitrarily excluding the other from accruing benefits. Such a construction is not only inconsistent with equitable principles, but offers a premium on fraud. Especially is this true where, as shown by the record in this case, the repudiating parties stand to gain several thousand dollars by barring the other party from the enterprise. The venture was proving exceedingly profitable, and under such conditions the temptation to exercise one's ''pleasure'' and deprive the other party from participating in the ''harvest money'' was so great that equity will hesitate to stamp such action with approval. A definite period was fixed for the continuance of the adventure, and even though the relationship is such that it may be dissolved at will, this does not carry with it the correlative that the rescinding party shall thereby become entitled to appropriate to his own use and benefit all the enhanced value and emoluments arising from

the venture. Equity will decree an accounting and just apportionment of the profits. As said in *Butler* v. *Union Trust Co.*, 178 Cal. 195 [172 Pac. 602], quoting from page 198: "A joint adventure, however, is similar to a partnership, and being of a similar nature, the right to an accounting of profits in accordance with the agreement therefor, and the obligations growing out of such agreement between the parties, are governed by the same rules of law." (Citing 23 Cyc. 453; *Petrie* v. *Torrent*, 88 Mich. 43 [49 N. W. 1076]; *Causten* v. *Barnette*, 49 Wash. 659 [96 Pac. 225]; *H. B. Claflin Co.* v. *Gross*, 112 Fed. 386. See, also, annotations to case of *Lind et al.* v. *Webber et al.*, Ann. Cas. 1916A, 1202, 1210, and annotations to *Jones* v. *Kinney et al.*, Ann. Cas. 1912C, 204; 33 Cor. Jur., p. 66; 14 Cal. Jur. 768.) ▮ The fact that the complaint alleged a partnership does not bar relief in the event that the testimony establishes only a joint adventure. (14 Cal. Jur. 768; *Peardon* v. *White*, 65 Cal. App. 463 [224 Pac. 263].)

The judgment is reversed and the cause remanded for further proceedings in accordance with this opinion.

Hart, J., and Finch, P. J., concurred.