[No. 38057. Department One. November 17, 1966.]

NELDON L. RICHENS, *Appellant*, v. GEORGE A. MICK *et al.*,
*Respondents.**

*Ralph Kenison*, for appellant.

*Halverson, Applegate, McDonald & Weeks* and *John R.
Lewis*, for respondents.

HUNTER, J.—This action arose from a dispute as to the
meaning of a contract entered into in the spring of 1961,
for the purchase and sale of a crop of potatoes prior to the
growing season. The plaintiff (appellant), a potato farmer,
contends the contract was for a sale of "field run potatoes,"
which included all potatoes produced in the field. The
defendants (respondents), potato processors in the Colum-
bia Basin, contend that the phrase "field run potatoes" was
used in the contract only to assure delivery of all the potatoes
in the field, to avoid the contingency of choice potatoes
being picked before delivery to the buyer.

The trial court stated that the phrase was ambiguous,
and that it was necessary to consider the contract as a whole
to arrive at the intention of the parties, holding that the
parties did not intend the phrase "field run potatoes" to

*Reported in 420 P.2d 202.

include the culls. Judgment was entered upon this interpretation of the contract. Plaintiff appeals.

The pertinent provisions of the contract are as follows:

1. The above named Grower shall deliver all the potatoes grown under this contract to either the Buyer's Plant or his designated storage house as directed by the Buyer.

2. The price to be paid for the Potatoes delivered under this agreement shall be $26.50 per ton for field run potatoes, of which 29% of net pay weight shall be 10 oz. and larger, and which contain a minimum of 50% No. 1. It is also mutually agreed and understood that for potatoes delivered under this contract which fail to meet the 50% minimum of No. 1, the price will be reduced 20¢ per ton for each 1% less than the 50% aforementioned, and for each 1% in excess of the 50% minimum, the price will be increased 20¢ per ton, to be added to the base price of $26.50. If the percentage of 10 oz. and larger of No. 1 and No. 2 exceeds 30% of the net pay weight, or more, the price paid the grower shall be $27.50 per ton. No. 1's, 2's, and Culls shall meet the specifications as further defined herein.

*No. 1 Grade Potatoes* shall consist of mature Potatoes of one variety or similar varietal characteristics which are fairly well shaped; which are not frozen; and which are free from freezing injury, blackheart, late blight, southern bacterial wilt, ring rot, soft rot, or wet breakdown, and free from damage as defined in Section 51.1554 of the United States Standards for Potatoes, effective July 15, 1958, caused by dirt or foreign matter, sunburn, greening, second growth, growth cracks, air cracks, hollowhearts, rhizoctonia, dried stems, insects, larvae, worms, wireworms, net necrosis, external discoloration, cuts, shriveling, sprouting, scab, dry rot, or other disease, or mechanical or other means; and shall be suitable in all respects for processing into frozen or other Potato products. The minimum diameter of any Potato shall not be less than two (2) inches and the minimum weight shall not be less than four (4) ounces.

*No. 2 Grade Potatoes* shall consist of mature Potatoes of one variety or similar varietal characteristics which are not seriously misshapen or frozen; which are free from freezing injury, blackheart, late blight, southern

bacterial wilt, ring rot, soft rot, or wet breakdown, and free from serious damage as defined in section 51.1556 of the United States Standards for Potatoes effective July 15, 1958, caused by dirt or foreign matter, sunburn, greening, second growth, growth cracks, air cracks, hollowhearts, rhizoctonia, dried stems, insects, larvae, worms, wireworms, net necrosis, external discoloration, internal discoloration, internal discoloration, cuts, shriveling, sprouting, scab, dry rot, or other disease, or mechanical or other means; and shall be suitable in all respects for processing into frozen or other Potato products. The minimum diameter of any Potato shall not be less than two (2) inches and the minimum weight of any Potato shall not be less than four (4) ounces.

3. *Culls* are Potatoes that do not meet the requirements of No. 2 Potatoes. There shall be no tolerance for culls, and culls will be paid for at the rate of ten cents (10¢) per ton. There shall be no tolerance for dirt and foreign material.

4. There shall be a minimum dockage of ten percent (10%) for dirt, rocks, and foreign material. However, if in the Buyer's judgment, Seller's delivery or deliveries contain an excessive amount of dirt, clods, sod, rocks, vines, weeds, trash and or other foreign material, Buyer reserves the right to furnish sufficient labor to hand pick excess rocks and trash from loads as delivered to processing plant and to charge back to Seller for such additional labor and also the weight of the rocks and trash from total delivered weight.

7. Potatoes delivered under this contract shall be inspected by inspectors appointed by the Buyer and approved by the Seller to determine the percent of No. 1 and No. 2 and Cull Potatoes at the time of delivery. The cost of such inspection shall be shared by the Buyer and the Seller on a fifty-fifty (50-50) basis. The grades determined by the inspectors shall be the basis of payment for the Potatoes purchased under this Contract.

 It is not disputed that the generally accepted meaning of "field run potatoes" in the trade constitutes all potatoes harvested in a designated field, including the culls. It becomes apparent that to apply this meaning to the contract would be inconsistent with the consideration of No. 1

and No. 2 potatoes, independent from cull potatoes in section 2 of the contract. Such a construction would also be inconsistent with the last sentence of paragraph 1 of section 2, when read with section 3 of the contract. Therefore, the generally accepted meaning of "field run potatoes" cannot be given to the phrase if the contract is to be rendered effective in its entirety. We must conclude that the parties did not intend to give a literal meaning to the phrase, as understood in the trade, but intended it to mean that which would render the contract consistent as a whole.

It is to be noted that although the contract refers to No. 1 and No. 2 grade potatoes, it does not fix a price for each grade. The base price is for both grades, and if culls are deemed to be excluded, then the contract would constitute a "field run" contract as to all the saleable potatoes (No. 1's and No. 2's) produced in plaintiff's field. Such a conclusion is fortified by the fact that the contract fixes a price of 10 cents a ton for culls, a nominal sum. If it is determined that it was the intention of the parties to enter into a "field run" contract for the purchase and sale, for a base price, of all the normally marketable potatoes raised in plaintiff's field—thereby excluding culls—meaning is given to the contract in its entirety. Any contrary interpretation would render parts of the contract ineffective. We hold that it was the intention of the parties to the contract that "field run" referred to the plaintiff's crop of saleable potatoes, which did not include culls.

The plaintiff further contends that if culls are not to be included in the base price of the contract, then the price must be computed upon the basis of the percentage of No. 1 and No. 2 potatoes, as determined by the inspector under section 7 of the contract.

The percentages determined by the inspector appointed by the parties are disclosed in the inspection certificates; for example, certificate A 1992 (exhibit 2) provides:

| Total Weight | No. 1 | No. 2 | Culls & Foreign Matter |
|---|---|---|---|
| 297,160 lbs. net | 49% | 27% | 24% |

The defendants contend that by reason of section 4

of the contract, they were entitled to deduct 10 per cent from the gross weight for dockage and to compute the amount of No. 1 and No. 2 potatoes by taking 49 per cent and 27 per cent, respectively, of the 90 per cent gross weight remaining. Defendants argue this was in accordance with custom and practice. However, custom and practice cannot be applied if it is inconsistent with the unambiguous provisions of the contract.

The plaintiff contends that the amount of No. 1 and No. 2 potatoes must be as determined by the inspection slip, and that since foreign matter was not segregated from culls, the 10 per cent dockage for foreign matter must necessarily be reflected in the 24 per cent item of culls and foreign matter. We agree. A 10 per cent dockage from the gross weight prior to applying the percentage of No. 1 and No. 2 potatoes, as shown in the inspection slip, would be contrary to the inspector's determination and would not properly compensate plaintiff for the delivered weight of No. 1 and No. 2 potatoes.

The defendants argue that the trial court was correct in deducting 10 per cent from the gross weight because the 24 per cent item does not show that the foreign matter included with the culls amounted to the 10 per cent dockage to which they were entitled; that the difference, if any, between the 10 per cent dockage and the actual percentage of foreign material should be spread equally across all the weight classifications. We must conclude that the defendants assumed the foreign matter included with the culls amounted to 10 per cent; otherwise, they would have required a segregation of the percentage of the culls from the foreign material by the inspector. Having failed to require the inspector to make this segregation, the defendants waived any further deduction for foreign matter under the contract.

The judgment of the trial court is reversed as to the computations of the percentage of No. 1 and No. 2 potatoes, and the cause is remanded for computation on the basis of

the percentages as reflected in the inspection certificates. The judgment is otherwise affirmed.

The parties will bear their own costs on this appeal.

ROSELLINI, C. J., HILL and HALE, JJ., and TURNER, J. Pro Tem., concur.