[No. 39566.   Department One.   June 5, 1969.]

LAVINE HENRY, *Appellant*, v. R. J. LIND *et al., Respondents.**

*Alec Duff,* for appellant.

*Guttormsen, Scholfield, Willits & Ager,* by *Frank D. Howard* and *Douglas K. Haughton,* for respondents.

HALE, J.—This case seems to prove the old saying that actions speak louder than words. Although the parties drew their own contract and now disagree as to its meaning, they did act on it and we look to their conduct to ascertain their intentions.

Harvey and Lavine Henry sold their small advertising business and their home to the defendants, Reuben and Mary Lind, husband and wife, on a written agreement prepared by Mr. Henry. The typewritten contract said in part

*Reported in 455 P.2d 927.

that Lavine Henry would retain a $275 per month salary from Firland Magazine during the 4-year term of the contract.[1]

For about a year after the parties had signed this agreement, Mrs. Henry received the salary and then was advised that Firland Magazine would discontinue its payments to her and would pay the Linds instead. She thereupon brought this action to recover the $275 per month for the remainder of the 4-year contract term, and now appeals the judgment of the trial court in favor of the defendants. We think Mrs. Henry is entitled to the money as a matter of law and reverse.

An examination of the record in detail shows that the court, although designating it as a finding of fact, concluded that the parties intended having Mrs. Henry receive the $275 per month only for such period as Firland Magazine or its publisher, Pep Publishing Company, would continue to pay it to her as its employee. We are in doubt, however, if the record shows substantial evidence to support such a conclusion, whether it be of fact or law.

Referring to the provision of the contract in issue, the court in its memorandum opinion said:

"The salary received by Lavine Henry *from the Firland Magazine* of $275.00 per month is to be retained by her, . . ." (Emphasis supplied by the court)

This part of the agreement in my opinion is clear and unambiguous; i.e., that Mrs. Henry was to receive $275.00 per month as long as the magazine paid the $275.00 per month to her. She received this amount for a year after the agreement was signed, and by the defendants' Exhibit 6, the Pep Publishing Co., the publisher of the Firland Magazine, cancelled this arrangement.

Thus, on the assumption that the Firland salary clause was clear and unambiguous, the court gave it a rigidly literal

---

[1]"The salary received by Lavine Henry from the Firland Magazine of $275.00 per month is to be retained by her, also, 5%, of the gross sales of all advertising are to be paid to Lavine Henry each month. R. J. Lind is to maintain all equipment and expense of operation including all taxes pertaining to the business.".

interpretation, so narrow, we think, as to be unwarranted by the circumstances proved.

■ The agreement appears to us to be unclear and ambiguous and, therefore, not susceptible of a literal construction. We are unable from the following language to determine precisely what the parties intended: "The salary received by Lavine Henry from the Firland Magazine of $275.00 per month is to be retained by her, also 5% of the gross sales of all advertising are to be paid to Lavine Henry each month." To ascertain its meaning then, it must be read in pari materia with the whole contract and in light of all of the circumstances surrounding it, and, if it remains unclear, resort must be had to extrinsic interpretative aids, including the conduct of the parties under it.

Although the contract does say that Mrs. Henry should retain the $275, it does not specify whether that provision shall be coterminous with the remaining provisions or continue beyond the 4-year term of the contract, nor does the provision indicate what shall happen either if the salary were discontinued, or, as actually occurred, paid to the Linds instead. The contract does not prescribe what services, if any, Mrs. Henry should continue to perform or whether the sum were to be deemed earned by Mr. Henry's services, nor does it show whether the right to $275 constituted a part of the consideration for the deal. It is as likely that the parties intended the $275 per month payable during the 4-year term of the contract to be part of the consideration for the sale of the business and residential realty as that it be deemed an earned salary for services performed. Thus, although the facts as to the execution of the written contract are not in substantial dispute, conclusions as to its meaning are. A more detailed review of the transaction, we think, will demonstrate the ambiguity.

The Henrys, as earlier noted, owned and operated the publishing business. Their principal customer was Pep Publishing Company which put out a magazine for the patients, staff and others associated with Firland Sanatorium. Under a 1959 written agreement with Pep Publishing, the Henrys received a 50 per cent commission for

obtaining advertising for the Firland Magazine and under another, an oral agreement, the $275 per month for performing some services in connection with the printing and publishing of the magazine. Mr. Henry did most of the work; his wife, plaintiff here, assisted primarily with maintaining the office files. Editing of Firland Magazine and writing of articles were done chiefly by patients in the sanatorium and for the $275 per month, the Henrys did most of the work in arranging the mechanical details of printing and publishing the magazine.

The Linds purchased the business on March 10, 1964, signing the written contract prepared by Mr. Henry. According to the agreement, they were to act as managers and perform all work required to operate the business, receiving a percentage of its income for a term of 4 years commencing May 1, 1964, and to become sole owners May 1, 1968. They agreed that Lavine Henry would retain not only the $275 per month from Firland Magazine, but 5 per cent of the "gross sales of all advertising . . . [were] to be paid to Lavine Henry each month."

As a part of the deal, the Linds purchased the Henry residence apparently without a down payment—a transaction contemplated by the contract for the sale of the business in the following language: "This agreement is contingent on the sale of the property of 18542 Ashworth Ave. . . . now owned by R. H. & Lavine Henry to R. J. and Mary Lind."

The Linds assumed in large part the management and operation of the business in May, 1964. Therafter, Pep Publishing for 11 or 12 months sent the $275 check, less payroll deductions, to Mrs. Henry, payable in her name—all without any objections, protests or manifest disagreement from the Linds. The Linds also, during this period, regularly paid her a 5 per cent commission on advertising as specified in the contract.

Mr. Henry died in April, 1965, and Pep Publishing made the next check payable to and sent it to the defendant, Reuben Lind. Two weeks later, April 26, 1965, defendant Lind notified Mrs. Henry that her $275 salary check would

be discontinued. Lind received the next succeeding salary check on April 30, 1965, and has received it regularly ever since.

Shortly after changing the check payment from Mrs. Henry to Lind, the chairman of the board of Pep Publishing, May 14, 1965, wrote to Mrs. Henry advising that, since the death of Mr. Henry, she had not personally participated in publishing Firland Magazine and that they were terminating their agreement and would no longer pay her the $275 per month. This letter, however, concerned the existing contract between the Henrys and Pep Publishing and it did not refer to—and, of course, as a matter of law could not affect—the agreement between Henrys and Linds.

In summary, for 11 or 12 months after the sale of the business, plaintiff received the $275 check (less payroll deductions) from Pep Publishing Company regularly each month, during all of which time defendant Reuben Lind acted as manager of and had control over the Henry-Lind business. April 30, 1965, shortly after Mr. Henry's death, Pep Publishing, instead of making the $275 check payable to Lavine Henry, as it had been doing throughout its agreement with the Henrys, made the $275 check payable to Reuben Lind and then notified Mrs. Henry in the letter of May 14, 1965, that her contract with Pep had been terminated. Thereafter, until trial of this action, Pep Publishing continued to pay the monthly amount to Reuben Lind to the exclusion of Lavine Henry.

In fairness to the Linds, it should be noted that the trial court found that the cancellation, as it is referred to by Pep Publishing "was not requested, encouraged or instigated by defendants," and we think this finding supported by substantial evidence. Since receiving the checks, however, the Linds have carried on the business in the same manner, rendered the same services, and performed their contract with Pep Publishing without substantial change. The record shows little difference between their operation of the business during the first 11 or 12 months when Mrs. Henry was receiving the checks, and their operations afterwards.

To ascertain the parties' intentions, the contract

must be read as a whole. *Richens v. Mick,* 69. Wn.2d 781, 420 P.2d 202 (1966). Pep Publishing Company's cancellation of the Pep-Henry agreement did not vitiate the Henry-Lind agreement for one cannot cancel an agreement to which he is not a party and with which he has no privity, nor did transfer of the salary check from Mrs. Henry to Reuben Lind operate to deprive Mrs. Henry of the right to it as between her and Lind.

■ Taken as a whole, the agreement, we think, remains unclear and ambiguous and leaves the intention of the parties in doubt. Thus, we think that the conduct of the parties in pursuance of the contract provides in this case the best clue to their intentions. If a contract is ambiguous in meaning, the practical construction put upon it by the parties thereto is of great weight. *Causten v. Barnette,* 49 Wash. 659, 96 P. 225 (1908). Or, expressed another way, when the language is indefinite or of doubtful construction, the practical interpretation of the parties themselves is entitled to great, if not controlling influence. *Topliff v. Topliff,* 122 U.S. 121, 30 L. Ed. 1110, 7 S. Ct. 1057 (1887). Here, the language was both indefinite and of doubtful meaning, and the parties themselves interpreted it.

For 11 or 12 months after the signing of the agreement for the purchase of the business, during which time the buyers were in managerial control of the business, Mrs. Henry received the check from Pep Publishing Company and a 5 per cent commission on the gross advertising revenue without argument, protest, or disagreement from the Linds. This period represented about 25 per cent of the total 4-year term of the contract. We think that the parties by their conduct put the ambiguity to rest. *State ex rel. South Bend v. Mountain Spring Co.,* 56 Wash. 176, 105 P. 243 (1909); *Amherst Inv. Co. v. Meacham,* 69 Wash. 284, 124 P. 682 (1912); *Tone v. Parlaman,* 154 Wash. 389, 282 P. 208 (1929).

We adhere to the rule that, where a contract is unclear and ambiguous, the interpretation placed upon it by the parties to it is entitled to great weight and may, in some

cases be of controlling influence. *Thayer v. Brady,* 28 Wn.2d 767, 184 P.2d 50 (1947); *Fancher v. Landreth,* 51 Wn.2d 297, 317 P.2d 1066 (1957); *Kennedy v. Weyerhaeuser Timber Co.,* 54 Wn. 2d 766, 344 P.2d 1025 (1959).

Accordingly, the judgment is reversed with instructions to grant plaintiff judgment in accordance with the views set forth herein.

FINLEY and WEAVER, JJ., and RYAN, J. Pro Tem., concur.

ROSELLINI, J. (concurring in the result)—I do not think the fact that the parties acted under the contract in accord with its written terms is sufficient to resolve the ambiguity raised by the failure of the contracting parties to specify the length of time Mrs. Henry was to receive the salary check which she had been receiving from the Pep Publishing Company. The fact that she was allowed to retain it as long as it was paid to her proves only that the parties intended that she was to receive it for that length of time.

The question remains, was it their intent that she receive the check each month as long as Pep Publishing Company paid it to any of the parties; or was she to receive it only so long as it was made payable to her personally; or was she to receive $275 per month regardless of whether Pep Publishing Company continued to do business with the Henrys?

In determining the intention of the parties, where the language is ambiguous, the court must examine the contract as a whole and also all of the surrounding circumstances, including the subject matter and the subsequent acts of the parties. *Hastings v. Continental Food Sales, Inc.,* 60 Wn.2d 820, 376 P.2d 436 (1962).

The contract reveals that the intent of the Henrys was to sell their business to the Linds, and that they were to be paid for it over a period of 4 years. A total purchase price is not mentioned, and the evidence does not show the total value of the business. However, the following circumstances are to be considered: Pep Publishing Company was the principal customer, and it had a written agreement

with the Henrys that they were not to assign their contract for advertising commissions without the consent of Pep Publishing Company. Its consent to this assignment was not obtained. It therefore becomes apparent why the contract provided that Mrs. Henry was to *retain* the $275 per month being paid to her by Pep Publishing Company, instead of providing that the Linds should pay her that sum out of their receipts from Pep Publishing Company. I think it also makes it clear why there was no provision that the payment was to continue for 4 years.

It is reasonable to suppose that the parties understood that, since Pep Publishing Company was the principal customer, the business would retain its value only so long as that customer was retained; or at least that, if it lost that customer, it would lose a large part of the value gained for it by the efforts of the Henrys. This explains why the contract did not call for a payment of $275 per month by the Linds, in which case they would have been liable for the amount even though their business relations with Pep Publishing Company were terminated.

Consequently, the reasonable meaning of the language was that, until the expiration of the contract or the earlier termination of payments by Pep Publishing Company, Mrs. Henry was to receive the $275 per month paid by Pep Publishing Company for publishing services. That right, given under the contract, could not be altered by the fact that the Pep Publishing Company unilaterally changed the payee on the monthly check. This was done because Pep Publishing Company decided to approve and ratify the assignment to the Linds. The parties to the Henry-Lind contract evidently failed to take this possibility into account when they drew their agreement, or if they did, they assumed that the language of the contract was adequate to assure that Mrs. Henry would continue to receive that portion of the purchase price covered by the Pep Publishing Company monthly salary check.

Thus, I agree that the trial court erred in holding that the parties intended that Mrs. Henry was to retain the check only so long as it was paid directly to her, but I think

that it is necessary to examine not only the contract and the subsequent conduct of the parties, but also the circumstances surrounding their agreement, to determine their intent.

August 5, 1969. Petition for rehearing denied.